## Eichel *et al. v.* Sawyer *et al.*

### (*Circuit Court, D. Kentucky.* November, 1890.)

1. Actions against Partnership—Burden of Proof.
   Where suit is brought against defendants as members of a partnership, and one of them denies his connection with the firm, the burden is on plaintiff to show that he is a partner.

2. Conversion by Brokers—Pooling.
   The act of factors in putting into a pool tobacco which has been consigned to them for sale on commission is not a conversion of the property where the consignors are at liberty to withdraw the tobacco from the pool, but acquiesce in the factors' action when it is brought to their knowledge.

3. Same—Constructive Conversion—Waiver.
   A constructive conversion by factors of property consigned to them for sale on commission is waived by the action of the consignors in treating the property as still their own, as by letters expressing their gratification at certain sales made by the factors.

4. Factors and Brokers—Authority—Advances.
   Where factors have made advances on property consigned to them for sale on commission, such property is thereby removed from the absolute control of the consignor, and the factors are invested with a discretion to deal with it so as to indemnify themselves first, provided that such dealing is in good faith as respects the interest of the consignor.

5. Same—Negligence—Evidence.
   Where the market for such goods is composed of a single buyer, in order to charge the factors with negligence in not selling it must be shown that this buyer made them a reasonable offer for the goods, sufficient to cover their advances thereon, and that they refused it.

6. Account Stated—Advances—Factors.
   Where factors transmit to their consignors accounts current showing the amount of advances made on goods received, and the consignors fail to point out errors therein within a reasonable time, their silence is an assent to the correctness of such accounts.

At Law.

This action was heard before the Hon. Howell E. Jackson and a jury. The plaintiffs, Eichel & Lowenthal, who were dealers in tobacco at Evansville, Ind., sued Sawyer, Wallace & Co., who were commission merchants in the city of New York, alleging that they had shipped to the defendants divers hogsheads of tobacco upon consignment, for sale for their account; that, in violation of their duty as commission merchants, the defendants had agreed with divers other commission merchants in the city of New York, and put this tobacco with the tobacco of the other commission merchants into a pool, under an agreement that none of it should be sold except under the direction of the pool; and that, in this way, the defendants had converted the tobacco of the plaintiffs to their own use, and were responsible for its value. The plaintiffs further claimed that the defendants had negligently failed to sell their tobacco at times when it could have been sold for a reasonable price, and asked damages upon their whole claim in the sum of $220,000. The defendants answered, denying the conversion, and denying negligence, and alleging, by way of counter-claim, that they had advanced to the plaintiffs certain sums, and that there were due to them from the plaintiffs other sums on account of storage, insurance, and commission, making an indebtedness from the plaintiffs to them of $186,541. At the conclusion of the plaintiffs' evidence the defendants declined to put

in any evidence, and rested their case upon the testimony introduced by the plaintiffs.

*Hargis & Eastin*, for plaintiffs.

*M. H. Cardozo*, *Charles S. Grubbs*, and *Humphrey & Davie*, for defendants.

JACKSON, J., (*charging jury.*) The plaintiffs in this case purchased tobacco at Evansville, Ind., which they shipped from time to time during the years 1884 and 1885 to the defendants, Sawyer, Wallace & Co., commission merchants or factors in the city of New York. The course of dealing between the parties, as explained by the plaintiff Eichel, was for Sawyer, Wallace & Co. to make advances to the plaintiffs on these consignments. The plaintiffs sue now to recover of the defendants for 1,549 hogsheads of tobacco, which they claim Sawyer, Wallace & Co.· converted or appropriated wrongfully, or negligently failed to sell when they could have sold by the exercise of reasonable diligence for prices that would have realized the plaintiffs, as they claim, $220,000. That is the claim plaintiffs make against the defendants. They state in their petition that besides Sawyer and Wallace and another member of the firm, whose name I do not remember, they also sue George A. Newman as a partner. Newman puts in a plea, and denies that he was a partner in the defendants' firm, the firm of Sawyer, Wallace & Co. It is for you to determine on that issue whether George A. Newman was a partner or not. The plea denying that he was a partner puts the burden of proof upon the plaintiffs. He did correspond, as it appears, for the firm, but the plaintiffs must satisfy you, by a clear preponderance of evidence, that he was an actual member of the firm, and, if they have not done so, you must return a verdict on this branch of the case for Newman.

The plaintiffs claim, as I say, $220,000 damages for the conversion or appropriation or neglect to sell 1,549 hogsheads of tobacco. The defendants answer that claim, and admit that they received in all from plaintiff 2,526 hogsheads of tobacco during the two seasons of 1884 and 1885. The plaintiffs in their reply state that they shipped to the defendants 2,537 hogsheads of tobacco. There is, therefore, as you will perceive, a discrepancy of 11 hogsheads of tobacco, that has not been explained in the evidence, so far as it has been brought to the attention of the court. The burden on that point is on the plaintiffs to show that they did send 2,537 hogsheads of tobacco, instead of 2,526, as claimed in the answer. The defendants say in their answer that they sold 1,125 of these hogsheads of tobacco, leaving on hand at the date of the suit 1,401 hogsheads, which they hold for the account of the plaintiffs. They say in their answer, and· it is for you to determine from the proof whether that is correct or not, that they accounted for every hogshead· of tobacco sold, being 1,125 hogsheads of tobacco. The accounts current rendered will show that, and they will also show what they had on hand when this suit was commenced. As to that 11 hogsheads of tobacco, the court can throw no light upon it, except to say to you that it is incum-.

bent upon the plaintiffs to show that they had that excess of 11 hogs-heads more than admitted by the defendants. The court cannot recol-lect, but you may be able to do so, some evidence on the point that they did have the extra 11 hogsheads. Mr. A. Lowenthal, Jr., puts the number of hogsheads shipped to these defendants from November, 1884, to September, 1885, at 2,174 hogsheads. The defendants admit, and, if there is no proof of a larger number, you will take their statement as correct, that they had received 2,526 hogsheads. If there is no proof on the part of the plaintiffs that they had shipped 2,537 hogsheads, you will take the statement of the defendants that they received 2,526 hogs-heads as the correct statement of the number of hogsheads shipped and received by them.

Now, gentlemen, in reference to the relations of these parties as con-signor and consignee, shipper and factor, principal and agent, and the rights, duties, and obligations arising out of those relations, court will give you some general instructions; but in all that the court will say you will have to look closely to the evidence to apply these general principles. When a consignment is made to an agent or factor for sale simply, there is a duty upon the part of the agent or factor to exercise diligence in the discharge of the duty that he undertakes to perform. The general principle is that, whenever any man undertakes to perform a work or render a service, he must be considered as bound to bring to the discharge of that work or the performance of the service the skill and diligence that is necessary to its proper performance. That is the general principle. So, when goods are shipped to an agent to sell, the agent is under obligations, upon receiving the goods, to exercise due diligence in the effort to discharge that duty. He of course must exer-cise or perform his functions faithfully and honestly, but, outside of that, over and above faithfulness and honesty on his part, he is required by the law to exercise due diligence to protect and to advance the inter-ests of his principal. He must not be guilty of negligence in the dis-charge and performance of his duty in the making of sales. Now these terms "diligence" and "negligence" need some little explanation. "Dili-gence" is a relative term, to be judged of according to the nature of the subject to which it is to be directed. "Negligence" is a relative term, more or less. It may consist of omission, or it may consist of commis-sion. "Negligence" is the failure to do what a reasonable and prudent man would have done under the circumstances of the situation, or the doing of something that a prudent and reasonable man would not have done under the circumstances. So you see it has the two aspects of omission or commission. Now, as I said, "diligence" is a relative term. Whether a man has exercised the diligence required of him by the law in discharging an agency or not must be determined by all the consid-erations surrounding the agency. We must look at the circumstances, and, as laid down by Story in the section cited a while ago, we must, in order to determine whether proper diligence has been exercised or not, look to the general customs of the trade. We must look to the course of business as to that particular line or character of trade, and

the common habits of business in the particular matter or article. We must look to the situation of the parties, and the way that the principal and agent deal with each other. Now those are the general duties, and every case must be determined upon its special circumstances,—its special surroundings. You would not expect a commission merchant to whom perishable articles, such as fruits and vegetables, were consigned, to exercise or require the same amount of indulgence and delay in making sales as you would in respect to lumber, or some other article that was not perishable. You can see that, from the nature of the article itself, from the nature of the business, from the course of trade, from the customs of trade at the point to which the shipper has consigned his goods for sale, that which might meet the requirements of the law as to diligence under one state of facts and circumstances would not be sufficient under different conditions. All that must be looked to. You can see that diligence in respect to one article might require that an expeditious sale should be made, that the agent should hurry the article on the market, while in respect to another article he might delay, or might exercise more discretion, and take more time. So I say you cannot, by one universal standard or measure, determine what time is reasonable and what is not for the performance of an agency, without considering the market, the course of business at that market, and the course of dealing between parties.

The court has been requested to instruct you that the mere fact that the defendants went into the pool of the 3d of December, 1885, and that they put 930 hogsheads of the plaintiffs' tobacco into that pool, was, in and of itself, under the evidence in this case, a conversion of the plaintiffs' property by defendants. That is not the law as applied to the facts in this case. In reference to that pool, the court wishes to call your attention to a few things. It is distinctly stated by every witness introduced on the part of the plaintiffs who had any knowledge of the subject, and by Mayo, Seibert, and Pollard, that all or any of the customers of the syndicate whose tobacco was incorporated or included in that pool had a right to withdraw it. It is further stated by these witnesses that they reserved to themselves the right to sell that pooled tobacco to any one else except Reynes Bros. & Co., the agent of the Spanish contractor, De Campo. Mr. Pollard further states that 3,200 hogsheads which were purchased by the pool in the west were not incorporated in the pool, and were not included in the subsequent sale of 10,000 hogsheads to De Campo, conducted through the agent, Bock. Now in that connection, inasmuch as it was the distinct understanding of all these parties that formed the pool that the customers had a right to withdraw their tobacco from the pool when they desired to do so, the question is not material in this case whether defendants notified the plaintiffs that 930 hogsheads of their tobacco had been put into that arrangement, provided the knowledge came to plaintiffs in any other way, and they got all the information about it that they needed and wanted. What is the evidence on that point? The court feels at liberty to comment upon this evidence, but in doing so you must understand that the

court does not mean to usurp your province, and does not mean in thus referring to the evidence that you should conclude that the court is correct. But the court has to watch the evidence closely, in order to apply the law of every case. Col. Martin, the last witness for the plaintiffs, stated in your presence this morning that he knew when the pool was formed, and that within a day or two thereafter he notified the plaintiffs of its formation, early in December, 1885. Mr. Bretano, another witness for the plaintiffs, tells the court and jury that he knew that plaintiffs heard of it early in December,—by the middle, at least,—at Paducah. One of the plaintiffs tells you that he did hear of it at Paducah. This plaintiff tells you, furthermore, that he heard of it through a Mr. Simmons at Evansville, and the letters of plaintiffs, produced by the defendants, and introduced in evidence, disclose a state of facts that put it beyond question that they did ascertain the existence of that pool, and wrote the defendants on the subject on the 24th of December, 1885. The letter is in evidence, and, if the court in giving its substance should fail to give it correctly, counsel on either side will call the attention of the court to the letter itself, and it will be read. Whatever Bretano and whatever the plaintiff Eichel stated on the stand as to the time he had information on the subject, he writes to the defendants under date of December 24, 1885, approving of the pool combination, and expressing the hope, or the doubt, rather, whether they will be able to maintain it, and encourages them to proceed in the effort to maintain it. He fears that they will not be able to hold out. Eichel learns about that time that defendants or the pool have an agent in the west buying tobacco. He further writes under date of December 26, 1885, asking for particulars. To that letter Newman responds under date of December 29, 1885, giving him the outline of the pool, and, under date of January 9, 1886, he says to these defendants that he had all the information he desired. Now, gentlemen, with the right to withdraw this tobacco at any time from the pool by the mere statement to these agents of their wish to withdraw it, if you find from the evidence that plaintiffs, with the knowledge of the pool, approved of the combination, and acquiesced in their property remaining in that situation, and made no demand upon these defendants to withdraw it, they cannot claim that it was converted by the act of putting it into the pool. The court instructs you that it was not converted by the defendants under such circumstances so as to give these plaintiffs the right to call upon defendants for the value of the tobacco at that time.

When an agent transcends his authority, or deals with the subject-matter of his agency out of the usual course of business, it is the duty of the principal, when it is brought to his attention, to ratify or disaffirm the agent's action, and, if he does not disaffirm promptly, or within a reasonable time, he must be treated as acquiescing in what is being done, especially when it is being done in good faith, and for the promotion of the principal's interest. So, if you find these letters as written and as stated by the court, you will find that plaintiffs acquiesced in that pool arrangement, and therefore cannot claim a conversion or a misap-

propriation of this property by defendants for the act of putting 930 hogsheads of tobacco into that pool. Other letters of plaintiffs and their subsequent dealing with the tobacco are put in evidence as corroborative of such acquiescence; that on October 14, 1887, in Eichel's letter from Paris, he says, in substance, that he did not look for any sales until the next year. In his next letter, of the 7th of January, 1888, he says he does not favor the policy of pressing his lugs on the market. In the subsequent letter of the 14th of January he fixes or designates the price that will bring him out at seven cents per pound, to which the defendants replied, under date of the 18th of January, 1888, that, while they note his views, and concur in his hopes and expectations that the market will advance, they want him to understand that they are not to be controlled by his fixing that price, unless he will make further advances or margins that will be necessary for their protection. Counsel for plaintiffs have commented upon that letter, and deny the right of the defendants to make such a reply, or assert such control over the tobacco. That brings the court up to another question, as to the relations, rights, duties, and obligations of these parties to each other under the facts of this case.

The mere consignment to an agent to sell imposes upon that agent the duty of looking exclusively to the interest of his consignor, and of performing his services and discharging his duties within a reasonable time. He is bound, as a general rule, to obey the instructions of his principal. That is the general rule. But that rule is changed, or very materially modified, when the factor has made advances upon a consignment. When a factor makes advances upon a consignment, unless at the time of accepting the consignment and making the advances there is some stated agreement between the consignor and consignee that the consignee shall hold for a fixed period, or for a fixed price, the control as to the time and mode of sale passes out of the hands of the consignor to those of the factor. It is true that the factor must act in good faith. It is true that he must exercise the right that is then given him to control, to a large extent, the sale of the property, and its management and its price, in good faith, so as not to abuse the trust, nor to sacrifice the consignor; but, after he has made advances upon the property consigned to him without any agreement as to the time of sale, or price at which sale should be made, the factor cannot be controlled by subsequent orders from the principal. He has the right to look to his own protection, looking honestly and looking reasonably to his own protection. He has a special property in the thing or article that is consigned to him, and on which he makes advances. You may call it a "lien," or a "special property," or a "special interest,"—no matter what. He has the right to possession, and he has the right to control the property for his interest and for his indemnity. Fairly, I say; honestly and reasonably. The factor has the right to do that, and especially has he the right to deal with the consignment with a view to his protection and indemnity when the consignor is insolvent, or is unable pecuniarily to meet the demands of the agent or factor for advances made to him.

Now, I say to the jury on the evidence in this case that there is no

actual conversion or appropriation of this property by the defendants. Have the defendants exercised diligence to make sales, or have they been guilty of negligence, such as would impose upon them a liability for this tobacco at any given period? In passing upon this point you must look carefully to the course of trade and course of business in regard to this particular article in the city of New York. The plaintiffs produced a letter written to them by defendants under date of December 1, 1885, in which they were informed distinctly that there was only a "one-man market." In Newman's reply to Eichel's letter of the 26th of December, 1885, it is again stated that the market for lugs and for tobaccos suitable to the Spanish market was a "one-man market;" that there was no buyer but Reynes Bros. & Co. Now Mayo, Seibert, Pollard, and every witness who has been introduced before you testifies to that fact, that while they made quotations as to the prices, they could not obtain those prices on the market. They had to wait the movements of the one-man buyer on the one-man market. Mayo's statement in his deposition, which is here at hand, is that "those were the quotations, but they could not get the prices quoted for a lot of tobacco at any time." They put their samples out, and waited the movements of this one Spanish buyer. He bought lots here and there, as he thought proper, and depressed the market as far as he could do so, and that led to the formation of the pool. It is not material for the court to say whether that pool was contrary to the law of New York or not, and the court does not think proper to go into that. If the plaintiffs acquiesced in it, they cannot claim any benefits arising out of its illegality. Now I say you must look to the nature of the market. What would be negligence in an agent in selling a bale of cotton, for which there is a constant demand all over the world, or from numerous sources, would not perhaps be negligence in a factor undertaking to sell a hogshead of tobacco which had but one market, and one man in the market doing all the buying. I say that is what you have to look to in order to pass upon this question, as to whether there was negligence or whether there was diligence on the defendants' part. It was not to be expected or required of these defendants that, having made these large advances upon this tobacco, they could recklessly force it on the market, and sacrifice their advances. The plaintiffs had rights which they could have exercised, if they had thought proper, whenever they were dissatisfied with the holding of the tobacco, or the delay in selling. They could have repaid to these agents the money that they had advanced to them, with the proper charges, interest, insurance, storage, etc., and reclaimed control and possession of their tobacco, and disposed of it as they pleased. But the defendants were under no obligations to sacrifice it, or injure their security, by a forced sale, especially when the plaintiffs were from time to time advising against pushing the lugs on the market. You must, therefore, in passing upon this question which the court does refer to you, as to whether defendants have been negligent in this transaction, you must look to the state of the market, and the course of dealing with respect to this particular kind of tobacco. Could the defendants in this case have made a sale which would have protected themselves, as well as protected the interests of the plaintiffs? Where is the evidence

of that? Is there any evidence of it? Is there any evidence—and, if there is, the court has not seen it—that they neglected to sell when they had an offer for this tobacco? Is there any evidence that they pushed their own tobacco, or other people's tobacco, on the market in preference to the plaintiffs'? The court has not heard it. The court has heard no evidence in this case to show that they either waived the exercise of the rights they had, or that they neglected to sell when an opportunity was offered. In that connection it is proper to refer to the evidence given in by the plaintiff Eichel as to what occurred on his first visit to New York after he had been notified about the pool. He had an interview with Newman in the defendants' office. He had, he says, at that time an offer for the tobacco at 6½ cents or 6¾ cents, but that he did not tell Newman the price that had been offered. In his second interview, some weeks afterwards, on his second trip to New York, he says he did tell Newman who the proposed purchaser was, and on that second trip he states that he said to Mr. Wallace, of the defendant firm, that "the course you are pursuing will prove ruinous, if continued, to the owners of tobacco." There was no demand to take the tobacco out of the pool. That did not constitute a demand to take it out of the pool. So, too, in reference to all the attempts or negotiations about money arrangements through Col. Martin and the house of David Dows & Co., Lowenthal & Co., and Rice and others, to enable plaintiffs to release the tobacco, not from the pool, but from the possession and control of defendants. That does not amount to anything. If they wanted to take the property out of the hands of the defendants, as the court has already intimated, nothing short of tendering defendants the money due them would have put upon them the duty and obligation of turning the tobacco over to plaintiffs. It is not pretended that that was done.

Now, gentlemen, the court has gone far enough into all this evidence. The court instructs you that the burden of proof lies upon the plaintiffs to establish their allegations of conversion and negligence. They have not, in the judgment of the court, shown any conversion or appropriation of this property by the defendants so as to make them liable for its value. Whether defendants have exercised reasonable care and diligence, such as prudent and reasonable men ought to have exercised in affecting a sale, or whether they have done in the matter what a reasonable and prudent man ought not to have done in making sales, is for you to determine as a matter of fact. In determining it, you must bear in mind, as the court wishes to impress upon you, the course of business, the habit of that particular market, the dealers in the market, the opportunities for selling, and whether they neglected to avail themselves of an opportunity to sell at a price that would save themselves, as well as advance the interests of the plaintiffs.

The court is asked by counsel for plaintiffs to give this instruction, which the court gives:

"If the jury believe from the evidence that the defendants received plaintiffs' tobacco with the discretion on the part of defendants to sell same, then it was their duty to exercise reasonable care and prudence in selling, and making efforts to sell, said tobacco within a reasonable time from its delivery;

and, if defendants failed to exercise such care and discretion, the law is for the plaintiffs, and the jury should find for them the highest reasonable value of said tobacco prevailing at any time during such failure."

The court has given you that already in substance with the qualification, and with this proper restriction, that you must regard the situation of the parties, you must regard the nature of the article, you must regard the character of the market, you must regard the course of dealing in that market with this particular article. Were there buyers to whom the defendants could go and say, "Take this property," at this price or that price? Were there? If there were, it was their duty to make the effort to sell to them; but if there was a one-man market, as the proof introduced shows, and you believe that proof, and that they had to wait, as these witnesses state, for the approach of that buyer, then to make the defendants guilty of negligence it would have to be shown that the buyer did approach them, and offered to buy this particular tobacco at a reasonable price, and that they did not sell.

The defendants have put in a counter-claim, and it is admitted in the answer, that the defendants advanced one hundred and ninety-five thousand and odd dollars to the plaintiff. They now claim that, after proper credits, and transferring from the old account of 1884 a balance of $8,-888.98, that stood to the credit of these plaintiffs on the 1884 account, there is a balance due them of $186,541 up to the 15th of January, 1890. Now, gentlemen, in reference to that counter-claim. In 1885, 1886, in May, 1887, May, 1888, and on the 13th of May, 1889, the defendants rendered plaintiffs' accounts current showing the amount the plaintiffs owed them for advances, interest, insurance, commission, and storage, etc. One of these accounts, perhaps the account of 1886, the plaintiffs acknowledged the correctness of; but, whether they acknowledged the correctness of these accounts or not, when they received those accounts, and did not, in a reasonable time thereafter, point out errors, or deny their correctness, the law treats their silence as an admission of their correctness. Accepting accounts current without complaining, without a statement of errors, is an acknowledgment by the debtor of their correctness. In addition to the amount stated in these accounts current, defendants state from time to time, running through the years of 1885, 1886, 1887, 1888, and 1889, the number of hogsheads of plaintiffs that were still on hand. The court instructs you, as asked for by counsel for defendants on that point, that plaintiffs have acknowledged thereby their indebtedness to defendants for the amount stated in these accounts current, which, with interest up to 15th of January, 1890, amounts to the sum of $186,541, which should be your verdict for defendants on their counter-claim.

One other point which the court thinks proper to call your attention to. If there had been a conversion, it would have been, at the most, a constructive conversion, which the plaintiffs could waive or not. But when the plaintiffs get statements from time to time for 1886 and subsequently, and when they express their gratification at the De Campo sale, as in their letter of April 30, 1886, they must be treated and considered as dealing with the tobacco as their own, and so on through

subsequent periods, and in subsequent letters, they treat the tobacco as their own, and they cannot go back behind that. Such conduct on their part is a waiver of any right they had to claim as for a constructive conversion of the property antecedent to the dates of those letters.

You must deal with these transactions, gentlemen, as the parties dealt with them themselves. Men's after-sights are better than their fore-sights, always. We cannot judge of them by what they may say now so well as we can judge of them by contemporaneous current transactions and statements of the parties while the business was going on. Looking to those, we cannot find an actual or constructive conversion of this property that the plaintiffs have not waived under their own letters and course of dealing between them and their agents. You will return your verdict, if you find for the plaintiffs, as the court has indicated as to the amount of damage they have sustained because of negligence upon the part of the defendants in not selling their tobacco. You will return, as a matter of course, a verdict for the defendants for the full amount of their claim, with interest or not, at your discretion, after the 15th of January, 1890. You will also make a return as to whether Newman was a partner. Make a separate return as to that.

*Mr. Hargis.* Though they may have waived the constructive conversion, that does not relieve the defendants from the performance of duty in regard to this tobacco.

*The Court.* Not at all. Plaintiffs may waive a constructive conversion. As the court considers, from these letters they have waived any constructive conversion, if any such was committed. There was no actual appropriation of this property by the defendants to their own use. If there was any constructive conversion, plaintiffs have waived it by these letters and subsequent dealing with the property. If, however, you find the defendants guilty of negligence in not effecting a sale that they ought to have effected, looking to their own interest and their own protection, as well as the right of the plaintiffs,—their own protection first, their own indemnity first, and the reasonable rights of the plaintiffs afterwards,— if they have negligently failed to discharge their duty in making a sale, that is a different question; and if you find them guilty of such neglect, if you believe from the evidence, under the character of market and the circumstances of the case, that they could have made a sale, and negligently declined or refused to do so,—then you charge them with the value of the tobacco at such time.

*Mr. Humphrey.* I would like for your honor to call the attention of the jury to the fact that the defendants will hereafter have to account to the plaintiffs for these hogsheads of tobacco.

*The Court.* The court instructs the jury that the tobacco on hand is the property of plaintiffs, and will have to be accounted for by defendants to plaintiffs in the event the jury think and find that defendants are not chargeable with its value because of neglect in failing to sell.

The jury found a verdict against the plaintiffs, and in favor of the defendants, in the sum of $186,541, but without interest.